Mr. Meckler. Good morning, Your Honors. May it please the Court. Bruce Meckler on behalf of the appellants, M.G. Skinner and W.C.C.P. W.C.P.P. The crux of this appeal today, which Your Honors, I'm sure are aware, is really the remnants of a massive insurance fraud that was perpetrated actually in this district against my clients and many others who were large purchasers of insurance. The fraudster involved, J.R.S.O. and Michael Ward, are now incarcerated. What that leaves is a cause of action that we filed as the purchaser of this insurance against a chain of brokers. In this case, and I say this most respectfully, I think the district court simply got it wrong. Of the cases I've had in my career, I think this case clearly warranted the right to present the case to a jury. There are six or seven major categories of fact issues that really must have been decided and needed to be decided before any kind of decision could be rendered in this case. The district court granted two summary judgments and really, in granting summary judgment, really ignored all of the or most of the substantial factual issues that existed. Moreover, the district court, I think, ignored, or at least didn't reference it in his opinions, a leading case from the first district appellate court in Illinois called the AYH versus Avico case, which frankly is very, very similar to this case in terms of broker liability and the use of subagents to acquire insurance of this sort. I think that's really what the court got wrong. We, of course, respectfully ask this court to reverse what Judge Gettleman did. Interesting, this case involved two complex insurance placements that were very interrelated. The purchasers of the insurance, my clients, were basically the same parties in both. One is referenced as the WCPP placement. The other is referenced as the Mayan placement. The WCCP placement involved $3.5 billion of real estate, both multi-tenant and commercial insurance on that involving $400 million of insurance and $5.5 million of premium. The Mayan involved dozens of properties involving a premium of close to $300,000. Both of these policies were placed really through a chain and the AYH- Help me understand that because the way I've got it diagrammed here, I've got two versions of the facts and your theory is that there is a chain of subbrokers that runs from MGSA to MCRISC to NCAIG, then through Norman Spencer and then finally to Ward and JRSO. It didn't seem clear to me from reviewing the record that I could see that that actually accurately reflects Norman Spencer's role here. I didn't see that NCAIG went to Norman Spencer and said find some insurance for us. Norman Spencer, it seemed, had a role as a servicer more to Ward and JRSO. It wasn't a chain of subbrokers, but some sort of service arrangement that occurred at his company. I actually think, Your Honor, that Norman Spencer served multiple roles. I think Norman Spencer certainly was going to at the end be a servicer and an issuer of the insurance that was being requested here. In fact, in the Mayan placement, Norman Spencer in fact issued- That one's a little different. Right, but the role of Norman Spencer was going to be the same. What occurred was NCAIG had this direct contact with Michael Ward and JRSO, the frauds group, and they had another company that had been involved previously in helping them access the market, place the insurance. Was that the Mulberry? It was the Mulberry firm, exactly, and they replaced right at the time that WCPP approached MCRISC who approached NCAIG to place this insurance, they were replacing Mulberry with Norman Spencer. I think Norman Spencer's role, if you read the Memorandum of Understanding, which is in the record, that really sets forth all of the functions and role that Norman Spencer was going to play, it was much more than just a servicer. They were going to evaluate risk, they were going to issue policies. We think they were also going to participate in the placement of the policy, which is an amorphous term, and of course you're dealing with at the end of the day someone who is perpetrating a fraud, the ultimate issuer of the policies. But I think Norman Spencer's role was much greater, but either way I think Norman Spencer still had the duty and certainly in this case was a sub-agent and was approached as a sub-agent by NCAIG, who of course was approached to be a sub-agent of MCRISC, who of course was MGSA, excuse me, Skinner Associates. So what really happened here, and I think sort of the biggest issue that frustrated I think the district court in its analysis was that the first issue that sort of dominates is, was there a sub-agency relationship entered into? Your Honor's question actually is I think a very insightful question dealing with the nature and scope of a sub-agency agreement. Clearly my clients went to MCRISC, who was an insurance broker. They very clearly went to NCAIG, who they very clearly went to Norman Spencer. Well that's the part that I don't think is so very clearly. The first two steps are very clear, but that third one not so clear. Well there's no doubt based on the record that Norman Spencer was asked by NCAIG to participate with respect to the JRSO insurance program. Yeah, but that's the nature of the participation is the rub. I think it would be helpful, and I certainly will address this in rebuttal when I bring it up, to look at the memorandum of understanding that was actually entered into between Norman Spencer as well as JRSO that really defined the roles that Norman Spencer was going to play. But either way I think Norman Spencer was a key player in the chain of brokers and participants in this placement. I mean it's undeniable that Norman Spencer ultimately would have placed, would have issued the policy in question, just as Norman Spencer issued the policy on Mayan. They were the issuing party. What about the little John affidavit which suggests that there was no Norman Spencer involvement? I think the record, your honor, is pretty clear that, first of all, we have no doubt that at some point in a two-month period during the months of November and December of 2011 that NCAIG, that Norman Spencer was in fact, to use Pelley's term, cut out of the WCPP placement. And I think that's what you're referencing in Mr. Little John's comments. But there's also no doubt, in fact I think it's undisputed, that there were multiple discussions and meetings and documents prepared by and between NCAIG, Norman Spencer and JRSO during the months of November and December relative to the placement and Norman Spencer's participation in any way you deem relevant to participate in this placement. And for a period of at least six to seven weeks, Norman Spencer was actively involved in this transaction. They were actively involved in negotiating with NCAIG the terms of what their engagement would be, the commission that they would receive, and I suspect the commission would be both for brokerage activities as well as issuance activities and other insurance related activities. But clearly by the end of December, we think, late December, I don't disagree with what Mr. Little John said, Norman Spencer was in fact cut out of the deal. But being cut out to me implies that they were, for some period of time, involved in the deal. And it's really clear that when Norman Spencer was involved in the deal, they were not only negotiating on their behalf to be involved in the WCPP placement, which was the big mother load placement that was involved here, of the entire JRSO placement, WCPP was the biggest of the whole package and it was a multiple package of placements. But at the same time that Norman Spencer was pursuing, pursuant to the memorandum of understanding that I referenced, to clean up for NCAIG and for JRSO, 64 different policies, and actually issue the policies, issue endorsements, etc., one of those of course was my end management, which my client, MGSA, was the program administrator for in the same capacity as they served for WCPP. They were in fact insured, or one of the insurers. So that was one thing that Norman Spencer was doing, and Norman Spencer in fact actually issued the policy, which turned out to be fraudulent, and in late December added additional properties that my end management needed, added to the property. I think the district court got that wrong when he said that Norman Spencer didn't issue the policy, because policies had previously been bound. Well the policies hadn't been bound because they were fraudulent. So how could they have been bound? The third thing of great importance that Norman Spencer was doing during the same time period in November and December was they were investigating Michael Ward, and they were investigating JRSO, and they determined in their investigation, one, that in 2007 the Department of Insurance of Illinois had entered a liquidation order and filed suit against JRSO, freezing and shutting down their business, seizing their assets, their bank accounts, on a program, and taking away any licensing that Mr. Ward had, which already had expired. They also discovered in the same time period, November and December, they also discovered that the reinsurance agreement that Mr. Ward claimed supported the insurance that was being proposed here was at best highly suspicious, at worst fraudulent. Norman Spencer received copies of reinsurance agreements that weren't signed, that had inconsistencies, that had different dates on it, et cetera. And what did Norman Spencer do with respect to this information? Did they ever tell anybody in the chain? They kept it to themselves, didn't warn any of the producers in the chain with the exception. I'm sorry, I'm familiar with that passage in the record, but I'm wondering what about the impact of the fact that, I believe it was, I think it's Brian Norman the Younger. He was either satisfied or, I guess I'd put it that way, he was satisfied with his investigation and he was still gung-ho to get involved with both feet with JRSO on this WPPC, WCPP placement. So he apparently reached the conclusion that the explanations were adequate, that there was some confusion about the documents from Swiss Re and the workers' comp problem from Illinois that was being worked out, and so he didn't really think there was anything wrong at that point. As your Honor knows and as court knows, there was communication between Mr. Littlejohn and Mr. Norman concerning the investigation of Ward, and in fact, you're correct, Mr. Littlejohn was in fact satisfied, or at least he appeared to be satisfied, with what he'd heard, which of course were excuses that turned out to be without any merit or foundation. He turned out to be involved. It was bad news in retrospect. I think Mr. Littlejohn and NCIG was equally as culpable to my clients as was Norman Spencer, but that doesn't absolve Norman Spencer, in my view, of their duty under the AYH case to send out the warning. In AYH, the situation was identical. You had a third-level broker as part of a large insurance chain, just like this, whatever role Norman Spencer played, and information that one of the brokers had was about the poor financial condition of the Geneva Syndicate of the Illinois Insurance Exchange, which of course ultimately cratered. All the broker had to do was, according to court, place minimal effort, make a phone call, send a fax, and let the world, if you will, the chain, know of this issue, and had Mr. Norman and Norman Spencer done this to the chain of brokers that were involved in this placement, which they knew full well they were involved in, in some capacity, this whole fraud, I think, at least with respect to my clients, would have been avoided. They chose to be quiet about it, and in my view, and based on what I see the record is, there's no doubt that if there is a duty from Norman Spencer, and we believe there is, Norman Spencer breached that duty, and really the consequences of that breach and their actions were reasonably foreseeable to lead to the great damage that was imposed upon my client. One last comment before I sit down is, and I'll use some of my rebuttal time, I don't care, is that I think the kind of questions this court is asking, to me, reflect the fact issues that need to be examined. Juries should be able to look at what Norman Spencer's role is, not a court looking at summary judgment papers that was opposed. A court should be able to look, a jury should be able to look at sub-agency. A jury should be able to look at whether a request was made for insurance. These are the type of issues, I think, that the district court missed in granting summary judgment. And I'll reserve my last two minutes, I hope, for rebuttal. Thank you, Your Honor. All right. Thank you, Mr. Meckler. Mr. Toney. Good morning, judges. May it please the court. My name is Anthony Toney, and I represent the Norman Spencer agency. One thing that Mr. Meckler didn't mention is the fact that the lawsuit brought by WCPP and MGSA against Norman Spencer is brought pursuant to the Illinois Insurance Producer Liability Act, 5-2-2201. And that act, which is the basis upon which the complaint is framed, imposes a duty upon an insurance producer to procure coverage in response to a specific request from an insured. The specific word is not in the statute. The specific word comes from the case of Scopertus, which was a Supreme Court decision that was issued in March of this past year, 2015. And in Scopertus, the insurance producer had a 20-year relationship. And the owner of the store, Melrose Sundries, asked Mr. Carlini to come in and have a meeting with them to get insurance for their new business. They had started a new store. And Mr. Carlini sat with them and discussed all of their insurance needs, and he procured their insurance, a package policy. It did not contain workers' compensation insurance, which is a statutorily mandated coverage. In the depositions, it was concluded that the insured never made a request for workers' compensation coverage. There was never a discussion and never an agreement for Mr. Carlini to procure workers' compensation coverage. So when an employee was injured and there was no coverage, they sued Mr. Carlini, said, you've been dealing with us for 20 years, you know the coverages that we need, you didn't get us workers' comp. And Mr. Carlini's response was, no one ever asked me to get workers' comp, we didn't discuss workers' comp. And the appellate court said, in the absence of a request from the insured for coverage, there is no duty. The SCOPERTIS Supreme Court in approving that decision said the request has to be specific. So a request for insurance for my business is not specific. It didn't ask for workers' comp, they didn't have workers' comp, and Mr. Carlini's position was not only affirmed by the appellate court, but approved by the Supreme Court. Now let's look at this situation. Is there a sub-agency situation in these placements? Yes, there's a sub-agency situation. The sub-agency situation arises when MGSA goes to MC RISC, and MC RISC doesn't have a market for the program, so it goes to NCAIG. And NCAIG, in the WCPP placement, never went to Norman Spencer with a request that Norman Spencer procure the coverage. It's not just the FBI affidavit when Mr. Littlejohn says, Norman Spencer's not a part of this program, it is throughout the process. And in the period of time that Mr. Meckler says Norman Spencer was allegedly working for the program, Norman Spencer never was involved in the WCPP placement. If you follow the money, and it's usually not a bad way to go, the money went from MGSA, the $1,377,000, to MC RISC, which carved out its 2.5% commission and sent the balance to NCAIG, which carved out its 4 or 5% commission, and went to GERSO. Now the penny of that money, it didn't flow through Norman Spencer's accounts. It wasn't sent to Norman Spencer to send to GERSO. It went direct from NCAIG to GERSO and Michael Ward because Norman Spencer wasn't in that sub-agent chain in that situation. They did not participate. It's shown a number of times, there's an event that arose with York Claims. York Claims Service was going to be the claims administrator for the program. And a woman by the name of Jill Brickhouse at Norman Spencer got a claim and she couldn't identify who the claimant was, it wasn't in her database. So she contacts York Claims. York Claims comes back to Norman Spencer and says that's a WCPP claim. Well she calls Kent Littlejohn and says we don't know anything about this, and he sends an email to York Claims saying Norman Spencer's not involved in WCPP. Norman Spencer's only involved in NSA. And in his deposition, Kent Littlejohn said that going forward after they had their meeting in 11-11, Norman Spencer would be involved in all of the GERSO placements, all the placements of business into GERSO with the exception of WCPP. The argument that well if you're cut out of participation in a program you must have been at some point in is not supported by any evidence. There are a number of references in the briefs to Norman Spencer trying to get itself into the WCPP program. And repeatedly it's alleged that we were negotiating our commission, Norman Spencer was negotiating its commission in order to get itself into that program. And it's absolutely contrary to the record. The only reference to any discussion about reduced commission is in one page of the deposition of Norman Spencer where he said Kent Littlejohn asked him if he would consider reducing his commission. And there is no response to that. There's not another sentence, there's not another follow-up, there's no discussion about what his commission was going to be, there's no discussion about what it would be reduced to, and the record is clear that Kent Littlejohn asked Michael Ward to have Norman Spencer in the program. Norman Spencer is a very well-regarded national agency. And Kent Littlejohn was fairly inexperienced. But Michael Ward said no. Michael Ward is the fraudster. He was committing a fraud. He's got this 5.2 million dollar premium that he thinks he's going to collect coming his way. He doesn't want to give 2%, 4%, 6% to Norman Spencer. Now, with regard to the investigation issue, if I may, on the Norman Spencer role, Mr. Meckler points us to the memorandum of understanding for an accurate articulation of what Norman Spencer's role was or was proposed to be. Do you agree with that? Is that where we can go and look where to find out where? No, I don't agree with that. I was just going to address that next. If you read the email that Norman Spencer, it's in the record, I don't have the exact reference here, the email from Michael Ward said, attaches a draft I prepared from the notes I took at our meeting on Friday. And it proposes, I will do this, this, this, this, and this as the program administrator for JERSO. Let me have the benefit of your comments, suggestions, whatever. We never got a response to that. That document as a memorandum of understanding is a draft based on the notes that were taken at the meeting. It is sent to Michael Ward as a draft with a request that he give that document his input and that they would at some point come to an understanding and maybe actually sign an agreement. That never happened. And so it's a proposal if I am offering some type of maintenance services for your home and I say, I'll come and I'll cut the grass, trim the bushes, and clear the snow for X amount of money or whatever. And please let me know if that's okay with you. And you say, well, I don't need anybody to cut my grass, I do it myself. We're in the process of a Norman Spencer, in any way to that memorandum of understanding that was sent? Norman Spencer sent that memorandum to Michael Ward. He never got a response. Same thing with the commission. Kent Littlejohn said, would you consider reducing your commission so I can get you into this program? There was no further discussion. And in Kent Littlejohn's deposition, he says over and over again, Michael Ward said no to Norman Spencer being involved in WCPP. I just want to touch on management quickly and then the AYH case. If you read Judge Gettleman's order with regard to the motion for summary judgment on Mayan management, it says at the very beginning, the Mayan management policy, for lack of a better word, was bound on October 1. It was invoiced on October 4, $282,000 and some odd dollars was invoiced, MGSA, and it was paid on November 3rd. It's all prior to Norman Spencer becoming involved. Now Norman Spencer, after 11-11, had an oral agreement with the program administrator. As of 11-11-11, he's not part of WCPP and he's really not taking any action to become part of WCPP. Now prior to the meeting on 11-11, Brian Norman googled Mike Ward or Mike Ward and Gersow and found the order of conservation. He sent that to Kent Littlejohn. Kent Littlejohn had a conversation with Mike Ward and was told that's an old matter. It had to do with some type of compliance and it's been resolved. That's what Kent Littlejohn reported back to Norman Spencer who moved on from that. Now we get to the issue of the documents from Swiss Re. Understand where Norman Spencer was after 11-11. He is setting up to be a program administrator for what he believed was a legitimate insurance program and he has got to build up the documentation to run that program. Part of the documentation is a copy of a reinsurance agreement, which he asked for. He asked for it, then he got it, looked at it, said okay now I got to get on to the next thing. There's something else that happened, much more important I think. On January 9th of 2012, Jed Marash, who is MC RISC, who has the direct contact with MGSA and Michael Skinner, got a phone call from Steve O'Hearn at Swiss Re. Steve O'Hearn said we might have an issue. One of our offices out east had come upon a policy and we can't verify where this policy came from, who issued it and whether or not it's valid. I don't want to alarm you, I'm not saying this isn't what it should be, but there's an issue and I'm Steve O'Hearn, I'm an attorney for Swiss Re and I'm investigating it. Jed Marash sent an email to Kent Littlejohn and said, just got a call from an attorney at Swiss Re questioning the legitimacy of a policy, not one of ours, is this thing legit? That's his question. Jed is told to call Brian Norman. Brian Norman is the program administrator. Brian Norman calls Steve O'Hearn and he's told, he is told by Steve O'Hearn, look I'm just starting to look into this thing, I'm not suggesting there's anything wrong or there's any fraud, I'm just starting to look into this thing. And then he wasn't getting any response from Michael Ward and he wasn't getting any response from Michael Ward and people were getting nervous. On January 18th, nine days after Jed Marash received the phone call, MGSA and Mike Skinner send 1.3 million dollars or almost 1.4 million dollars to MC Risk, which keeps it, goes up to NCAG, they take their piece of it, it goes to MGSA. To suggest that we hid information from the rest of the brokers in the chain is a frivolous statement. It's interesting to me that the phone call from Swiss Re came directly to Jed Marash, but prior to, prior to the remission of funds, the remittance of funds from MGSA to MC Skinner on January 18th, MC Risk, NCAIG knew that there was a question, an unresolved question with regard to the Swiss Re involvement and that it hadn't been resolved as of January 18th and they never shared that information with MGSA. This started with your discussion of the Mayan management placement. I got off track. What I'm wondering is, did Norman Spencer have enough information? It's out of the chain, I understand your position, it's out of the chain with regard to WCPP, but it was issuing the policy to Mayan management, did it not have enough information given the conservation agreement, its own questions about Swiss Re and now Steve O'Hearn's call that it had some obligation to inform, not necessarily WCPP, but Mayan management? It issued that policy on December 6th. As the record will show, the information from Michael Ward with regard to Swiss Re policies came right after that, a short time after that. As Judge Gettleman said in his opinion, if Mayan management was a plaintiff, Mayan management may well have a suit against Norman Spencer because Norman Spencer's duties are owed to insureds under the statute. MGSA is not an insured, MGSA is an insurance for WCPP and provides other services for WCPP, but Mayan management, Norman Spencer had a duty to Mayan management and might have had exposure to Mayan management, but was never sued by Mayan management and was sued by MGSA and I think the court got it right because the duty runs to the insured, not to a fellow producer. In AYH, all I'll say is every producer in the chain was involved in the placement of the coverage and the third person in the chain in every one of those was the person who issued the policy. Not a situation as here where Norman Spencer is not in the chain and where Norman Spencer issued a policy, it did so as a program administrator for GERSO, issuing a policy that GERSO had previously bound and for which GERSO had been paid before Norman Spencer was involved. I think my time is up. I thank you for your time and attention this morning. Thank you, Mr. Tunney. Mr. Meckler. Your Honors, let me quickly respond to a number of points you raised. Norman Spencer, the Mayan deal was placed by Norman Spencer on December 6th. Norman Spencer learned of the order of conservation on November 8th, right before that. Norman Spencer learned of the suspicious reinsurance agreement on 11-16, November 16th. So we're clear. There is no doubt that Norman Spencer issued a policy. Whether or not that was a ministerial act or a substantive act, they issued a policy. There's also no doubt Norman Spencer received $25,000 in a fee or commission to clean up the 64 policies including the Mayan. I guess the response on that is that's a Mayan management's right of recovery, not MGSA's. And I'm delighted that you raised that, Your Honor. And that is just factually, the trial court factually got that wrong. MGSA was not an insurance broker placing the Mayan policy. MGSA was the program administrator, just like they were in the WCCP placement, and actually the client, if you will, with respect to the Mayan placement. There is an affidavit of Mr. Michael Skinner, president of MGSA that's appended to our response to the summary judgment motion, the second summary judgment motion, that clarifies that very specifically. I think Judge Gettleman just missed that. So there's no doubt that that Mayan management and the MGSA matter was placed. It was issued by Norman Spencer. Norman Spencer was paid a fee for that and putting aside WCCP for a moment, had Norman Spencer simply undertaken its duty to warn, as the AYH case suggests, and it's told... I want to make, and I'm holding you over time here, so I apologize to my colleagues here, but I understand your explanation is that MGSA suffered damages as a result of that placement of the Mayan management program, because you basically covered the loss. And we also paid the new premium plus the overage on the new premium. Wouldn't the issue be whether MGSA qualifies as an insured under the Illinois statute? I don't think there's any doubt that they would be under 2-2201, and it doesn't actually reference an insured. It references, 2201 references the duty that the insurance producers have, but just so your honors, and this is in the record, when the policies, when Michael Ward issued the fraudulent policy to WCPP, the insured was WCPP. It wasn't the 600 property owners, right? And likewise, the Mayan management ultimately was issued through WCPP. Exactly the same thing. The policy that was issued by Norman Spencer actually said to Mayan management, like everything else in that policy, it was wrong. The policy itself was fraudulent, but ultimately what happened was replacement coverage was found by, for WCCP and Mayan. They were all in one policy, and the insured was WCPP. So in none of these placements, and the record is clear on this, in none of these placements was MGSA acting as a producer. They were in fact a, they were the program manager and in fact an insured, and they had clients who came to them who participated in the insurance for all the properties that were subject to the sort of an insurance pool, if you will. The last thing I just wanted to say, and this responds, I'm sorry if I'm, if I could just spend two seconds on it. According to 22-2201, the liability, and I'll read it, an insurance producer shall exercise ordinary care in reviewing, procuring, binding, and placing. I have no doubt on this record that whatever role Norman Spencer was playing with respect to WCPP, they fit within that statute because they were binding the policy, and I did pull out the Memorandum of Understanding. What do you mean by binding? They actually, Norman Spencer, Your Honor, actually bound the policy. They issued a policy to Mayan management, and in fact in the Memorandum of Understanding, which is part of the record, which I have in front of me, that was one of the specific duties that Norman Spencer agreed to do, at least insofar as the Memorandum of Understanding provides with respect to JRSO. And your understanding is binding is used in the same way in the statute? Yes, it is, Your Honor. Yes. Binding, binding and placing. It's not just binding. It's binding and placing and procuring. So I would go for, I would frankly think that all of their activities fit well within that statute. And I guess the last thing I would say, and then I'll, with your, I'll sit down, is that, that whether or not the Memorandum of Understanding was ever agreed to or not sounds like a very significant fact issue as well. And listening to my opponent speak about this, these are issues I think that really do need to go to a jury, as do all the other issues that I've talked about here. Thank you very much, Your Honor. All right. Thank you, Mr. McClure. Thank you, Mr. Connolly. Thanks to all counsel. The case is taken under advisement. Court will proceed to the fifth case, Hill v. DeSantis.